**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

ERIC NDITA                                   CIVIL ACTION

VERSUS                                       NO. 12-2177-EEF-SS

AMERICAN CARGO INSURANCE, et al

<u>ORDER</u>

PLAINTIFFS' MOTION TO COMPEL (Rec. doc. 83)

**GRANTED IN PART, DENIED IN PART AND DISMISSED IN PART AS MOOT**

The plaintiffs, Eric Ndita, both individually and on behalf of all other similarly situated persons, seek an order requiring defendants, Gary Osorno, American Cargo Assurance, LLC ("ACA") and Accutrans, Inc., to produce documents.  Rec. doc. 83.

The trial is set for November 17, 2014.  The discovery deadline is October 3, 2014.  Rec. doc. 81.  On July 31, 2014, dates were reserved for depositions in August and September with August 25 as the first reserved date.  Rec. doc. 95.

Plaintiffs seek production of eight categories of documents.

**1.  <u>Emails to and from plaintiffs</u>.**

Plaintiffs seek all emails to or from them and all emails concerning any of them.  In their reply memorandum, the plaintiffs dropped their demand for all emails concerning them.  They only seek emails to or from plaintiffs.  It is not clear whether they also seek emails where one of the plaintiffs was copied.  Rec. doc. 99.

The complaint was filed by Eric Ndita, an inspector for defendants, and all other inspectors employed by defendants, who were not paid time and one half overtime pay for hours over forty.  Rec. doc. 1.  Conditional certification of a Fair Labor Standards Act ("FLSA") collective action was granted.  Sixteen individuals opted into the case.

Plaintiffs contend that the emails are relevant because:  (1) they are the central means by which ACA communicates with its inspectors; (2) they contain information on the hours worked by plaintiffs as they frequently record critical times; (3) they will provide an accurate record of all jobs assigned to inspectors to permit preparation of an estimate of the hours worked by each inspector; (4) they were used to convey policy instructions to the inspectors; (5) they reveal the capacity in which inspectors worked either as an inspector or as a supervisor; and (6) Ishmael Alvarado asserts a retaliation claim.

Plaintiffs argue that: (1) the request for all email is not overbroad because virtually any email sent to or by a plaintiff is likely to contain some relevant information; and (2) defendants' have not demonstrated that the burden of production outweighs the benefit to be derived from the production.

Defendants respond that:  (1) they produced plaintiffs' personnel files which contained emails regarding them; and (2) after two searches, defendants produced 18,554 emails with attachments.  Defendants chose emails with attachments because "the inspectors uniformly sent all time sheets, expense reports, and field reports as attachments to an email. . . ." Rec. doc. 92 at 3.  The time sheets and expense reports revealed the jobs worked and the field reports contained time logs.  Id.

Plaintiffs respond with a series of statements with citations to deposition testimony in support of their contention that there are significant gaps in the emails produced by defendants. Rec. doc. 83 (Memorandum at 7-9).  Defendants argue that plaintiffs' statements are inaccurate and misleading.  Rec. doc. 92 at 4-7.  Defendants numbered these statements (1-16).

Statement no. 8 was selected at random for examination.

> If the inspector has left the terminal, ACA <u>emails</u> the inspector the approximate time that pumping will conclude and the time that he is expected to return to the terminal to conclude the job. . . .

Rec. doc. 83 (Memorandum at 7) and Rec. doc. 92 at 5, No. 8(emphasis added).   Defendants

contend that this statement is inaccurate.   They state:

> Preferred communication is by telephone message.   Ordinarily the terminal would call dispatch and give dispatch an approximate time for the completion of the transfer.   Dispatch would then contact the inspector and advise [sic] they have before the transfer is estimated to be complete.

Rec. doc. 92 at 5.   Plaintiffs cite the deposition of Douglas V. Beaton, a Rule 30(b)(6) designee,

at page 92.   Defendants cite pages 83 and 92 of Beaton's deposition.   The entirety of page 83

appears below.

1      **Q Okay. Well, I'm just talking -- the first time**
2      **somebody's assigned to a job, does the dispatcher make**
3      **any written record of that?**

4          A No.

5      **Q How does the dispatcher notify the inspector**
6      **that he needs to be at a job in a certain amount of**
7      **time?**

8          A By phone message.

9      **Q Okay. Always by phone?**

10         A Typically.

11     **Q Well, how else was it done?**

12         A If he can't get in touch with him by phone, it
13     would be by text. But phone would be the preferred
14     method of communication.

15     **Q Okay. Phone, text, e-mail sometimes?**

16         A Third -- third case, yes.

17     **Q I assume typically they would try all forms of**

18    communication until they got ahold of the inspector?

19        A Yes.

20        Q And were inspectors supposed to acknowledge an
21    assignment in some way?

22        A Well, if they answered their phone, they said,
23    "Yes, I" -- "I'll be on my way out there."

24        Q And if they got it by e-mail or text?

25        A They would respond in the affirmative.

Rec. doc. 83 (Exhibit C at 83).  The last question and partial answer at page 91, the entirety of

page 92, and the first answer from page 93 from the Beaton deposition appear below.

23        Q  Okay. When the pumping time began, would there
24    be some communication with dispatch as to that time?

25        A Maybe, maybe not. It depended on the job.

1.        Q It wasn't a requirement?

2         A No. But obviously if it was part of the
3     information, it was transmitted in the update from the
4     inspector to the dispatch, then it would -- it would
5     be -- it would already be in there.

6         Q Yeah. And after, when the inspector returned
7     to the terminal for the closing procedures after pumping
8     time, would there be contact with dispatch noting the
9     times of his return and other times?

10        A The terminal, the facility would call the
11    dispatch and give them an approximate time for the
12    completion of the movement.  The dispatch would then
13    contact the inspector and tell them what time to be out
14    there.  "You've got an hour to go."  "You've got 30
15    minutes to go."  "You've got two hours," whatever.

16        The next communication, unless there was a
17    problem with the job that needed rectification on an
18    immediate basis, the next communication between the
19    inspector and the dispatch staff would be the closing

**20**    update that would show the completion times of the job
**21**    and the finish, sometimes including arrival times,
**22**    sometimes not.

**23**    **Q Was completion of the field report, that's a**
**24**  **separate activity from the communications you've just**
**25**    **been telling me about?**

**1.**    A Yes, sir.

Rec. doc. 83 (Exhibit C – ACA/Beaton Deposition at 91-93).

This deposition testimony demonstrates that:  (1) that a dispatcher typically notifies an inspector by telephone that he needs to be at a job in a certain amount of time; (2) if the dispatcher cannot get in touch with him by phone, he would text the inspector; (3) by phone was the preferred method of communication; (4) email was a third way; (5) all forms of communication would be tried until the dispatcher got in touch with the inspector; and (6) in connection with the closing procedures: (a) the terminal would call the dispatcher with an approximate time for the completion of the movement; and (b) the dispatcher would then contact the inspector and tell him what time to be there.  The Beaton deposition transcript supports defendants' contention that plaintiffs' statement no. 8 is inaccurate.  Plaintiffs have not demonstrated that there are significant gaps in the emails produced by defendants.

In their reply memorandum, plaintiffs concede some of defendants' position.[1]  Plaintiffs also raise new arguments in support of the request for the emails.  For example, they contend that

---

[1]  The plaintiffs' state:

> Defendants point out that many of the communications between ACA and its inspectors were conducted by telephone or text as well as emails, and in some cases, those modes of communication were preferred to emails. Even if that is true, that does not change the fact that many communications with Plaintiffs were by email as Defendants' own witnesses have confirmed.

Rec. doc. 99 at 2.

the emails will show communications with AccuTrans and this is relevant to whether AccuTrans is their employer.  Rec. doc. 99 at 2-3.

Assuming <u>arguendo</u> that there are gaps in the emails produced by defendants, the issue is whether the burden of a further search and production outweighs the benefits derived from the production.

Defendants argue that plaintiffs' request for all emails to or from and all emails concerning plaintiffs will impose significant burdens on them.  Rec. doc. 92 at 9-13.  They urge that the burden and expense of the email production outweighs its likely benefit.  Fed. R. Civ. P. 26(b)(2)(C)(iii).  Because plaintiffs only dropped their demand for all emails concerning them in their reply, defendants did not address the burden of producing only emails to or from plaintiffs.

Defendants submitted a declaration from Cody Caillet of Gulf Coast Solutions, Inc., a technology services firm.  Rec. doc. 92 (Exhibit 12)("Caillet Declaration").  Plaintiffs argue that Caillet reported that a back-up file was made on November 8, 2012 that contained all email items that were currently on the server as of that date.  Caillet Declaration at para. 8 and Rec. doc. 99 at 3.  Caillet reports, however, that:  (1) his firm did not become involved until March 2013; (2) because the "cloud" is used for back-up, people store files locally; (3) there is a risk of loss with locally stored files; (4) prior to the suit, ACA had no document retention policies; (5) prior to the suit, email management and retention were done on an individual basis; (6) in these circumstances, a deleted filed would be gone within a few days; (7) the mailboxes for terminated employees may be completely removed from the system along with corresponding email items; (8) there is no record of removed mailboxes prior to March 2013; (9) the November 8, 2012 backup file was created without his firm's involvement; and (10) to the best of his knowledge it "contained all email items that were currently on the server as of that date."  Caillet Declaration.

Because of the lack of a document retention program and other practices described by Caillet, it is likely that the November 8, 2012 backup file is incomplete.

Defendants demonstrate significant burdens in the production of all email to and from the plaintiffs. If the search is limited to the November 8, 2012 backup file and emails to and from the plaintiffs, it is likely that not all of the emails sought by plaintiffs will be found. This follows from ACA's pre-litigation practices described by Caillet. The burden of production outweighs the benefit to be derived from the documents. Plaintiffs' request for emails to and from them is denied.

**2.  Payroll records**.

Plaintiffs request all payroll data for them in CAV, Excel format, or native electronic format. They report that two of defendants' payroll providers produced detailed weekly records with each element that went into the weekly checks, but two of defendants' payroll providers did not provide such information.

ACA responds that it produced all payroll information in its possession, custody or control. It reports that during the relevant time, it employed three payroll vendors, Paychex, Netchex and ADP (and not four). Information was obtained from the vendors and provided to plaintiffs. The dispute concerns ADP.

ACA does not explain why two of the payroll providers can supply the information sought by plaintiffs but not ADP. **Within seven calendar days of the entry of this order**, ACA shall certify in an affidavit that: (1) it made a diligent search for the payroll information sought by plaintiffs in its own files and is unable to find it; and (2) it communicated with ADP that: (a) it requires the payroll information for a court proceeding; and (b) if ADP does not produce the

information or provide a statement explaining why it cannot produce the information, ACA shall
be required by the Court to subpoena the information from ADP.

**3.  <u>Unredacted copy of ACA/VIP purchase agreement</u>**.

Plaintiffs contend they require the purchase agreement between VIP Chemical and ACA
to determine whether ACA has liability for wage violations committed by VIP prior to the
purchase.  On May 7, 2013, defendants produced a copy in which irrelevant and proprietary
information was redacted.  Plaintiffs argue that it is not possible to tell what the terms were
regarding liability for VIP Chemical wage violations.

Plaintiffs have not demonstrated a need for the entire agreement.  The portion of the
agreement redacted between the clause beginning "SELLERS will be responsible. . . ." and the
clause beginning "[h]owever, with regard to litigation. . . ."  shall be produced to plaintiffs
subject to the terms of the protective order.  <u>See</u> Rec. doc. 92 at 4.  **This shall be produced to
plaintiffs within seven calendar days of the entry of this order**.

**4.  <u>Monthly financial recaps</u>**.

These documents were sought by plaintiffs for information on the gross revenue of ACA.
Rec. doc. 83 (Memorandum at 13).  Plaintiffs report that the request for information on gross
revenue is moot.  Rec. doc. 99 at 1.

**5.  <u>Job boards and documents reflecting jobs and job assignments</u>**.

This matter is moot.  Rec. doc. 99 at 1.

**6.  <u>Terry Dillon documents</u>**.

There is a pending motion for summary judgment to dismiss the claims of Terry Dillon.
Rec. doc. 86.  Defendants' contend that they should not be required to produce Dillon's
documents until after there is a ruling on this motion.  Plaintiffs do not object to a delay on the

Dillon documents until after a ruling.  Rec. doc. 99 at 7.  **If defendants' motion to dismiss the claims of Dillon is denied, defendants shall produce Dillon's documents within five (5) working days of the entry of the order denying their motion for summary judgment**.

**7.  Worker compensation documents**.

Plaintiffs contend that there is evidence that ACA's administrative secretary, Sherri Strode, changed hours on weekly timesheets to show fewer hours and destroyed the original time sheets for the purpose of reducing the hours reported to the workers compensation insurance carrier.  Rec. doc. 83 (Memorandum at 17).  Plaintiffs did not depose Strode.  Defendants deny the allegations.   They contend that: (1) plaintiffs possess the original time sheets; (2) they received the time sheets which were corrected or approved by Beaton; (3) there is no spoliation because the original time sheets were produced in their native format; and (4) time sheets were never used to affect the workers compensation premium.  Rec. doc. 92 at 19-21.

Plaintiffs reply that any alteration of work records is relevant.  They do not dispute defendants' contention that they have the original time sheets as well as the corrected time sheets submitted for approved by Beaton.   Plaintiffs' request for documents relating to worker compensation documents is denied.

**8.  Complaints concerning non-payment of overtime**.

Plaintiffs seek documents concerning complaints about non-payment of overtime.  Defendants report that Beaton, Osorno and Goode, the three persons in charge of the company since it began operations in 2009, are not aware of any complaints about non-payment of overtime.  Plaintiffs' citation to testimony from Chris Spivey, who was terminated during the litigation, is an insufficient basis to require defendants to search their server for documents

containing references to "overtime."  Plaintiffs' request relating to complaints for non-payment of overtime is denied.

IT IS ORDERED that:  (1) plaintiffs' motion to compel (Rec. doc. 83) is GRANTED in PART, DENIED in PART and DISMISSED in PART as MOOT as provided herein; (2) the parties' requests for sanctions are denied; (3) the deadline for the appeal of this order is **Wednesday, August 13, 2014**; and (4) in the absence of an order by the District Judge this order will not be stayed pending appeal.

New Orleans, Louisiana, this 6th day of August, 2014.

**SALLY SHUSHAN**
**U.S. Magistrate Judge**